**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| FLOYD STEEN, Personal Representative ) | |
| of Brandon S. Hilbert, deceased, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|        v. ) | CASE NO. 1:04-CV-174-TS |
| ) | |
| ROBERT MYERS, BRAD RIDENOUR, ) | |
| and CITY OF PORTLAND, INDIANA, ) | |
| ) | |
|     Defendants. ) | |

**OPINION**

This matter is before the Court on the Defendants' motion for summary judgment, filed on

July 15, 2005. The Defendants seek the dismissal of claims brought against them by the Plaintiff,

Floyd Steen, who is seeking damages under 42 U.S.C. § 1983 and Indiana law for the July 18, 2003,

death of Brandon Hilbert. Brandon Hilbert died in a motorcycle accident during a police chase and

Defendants Robert Myers and Brad Ridenour were the two officers who participated in the police

chase. For the reasons stated below, Defendants' motion for summary judgment is granted on the

Plaintiff's federal claims and the remaining state law claims are remanded.


**A.      Standard for Summary Judgment**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words,

the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party

2

cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443. However, a party's evidence must be "competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

3

**B.     Material Facts**

Resolving all genuine disputes and drawing all reasonable inferences in the Plaintiff's favor, the following facts are presumed true for the purposes of deciding whether summary judgment is appropriate.

At around 1:25 a.m. on July 18, 2003, Portland City Police Officer Robert Myers observed Brandon Hilbert and a passenger, Robyn Philebaum, on a motorcycle on East Main Street. The motorcycle was standing still when Myers spotted it. Myers had not seen Hilbert on a motorcycle before. Myers had previously heard from other police officers that Hilbert may have had his driver's license suspended. He told Officer Brad Ridenour to watch for Hilbert because he believed Hilbert's license had been suspended and that he probably did not have a motorcycle endorsement. Myers stopped on Meridian street and requested the police radio communications operator to run a driver's license check on Hilbert.

Ridenour observed the motorcycle drive to Hayes Street, where Hilbert and his passenger parked and got off the motorcycle. Ridenour communicated with Myers regarding Hilbert's movements. Myers drove by this location and observed Hilbert and Philebaum on the motorcycle, stopped in a gravel area at Hayes and Water Street. Myers turned around and drove past the motorcycle again, only this time Hilbert and Philebaum were not there. Myers drove to the corner of Munson and Maine and parked there, anticipating Hilbert would soon drive by that location. While there, at about 1:31 a.m., he received a response from the police radio operator that Hilbert's license was suspended and that Hilbert did not have a motorcycle endorsement. Ridenour also received this information. After hearing this information, Myers's intended to issue citations to Hilbert.

4

When Hilbert did not drive past his location, Myers drove on Main toward Hayes street, where he stopped for a few seconds. As Myers turned onto Hayes street from Main, he saw Hilbert making a U-turn on Hayes street, going south. Myers began following Hilbert. At the intersection of Hayes and Water streets, Hilbert stopped and then turned east onto Water street. When he reached Morton street, he quickly accelerated. At this point, Myers was a block behind Hilbert. Myers began accelerating in pursuit of Hilbert. As he accelerated, he activated his red and blue lights. The chase followed State Road 26 east. Myers stated that he maintained a distance of at least a quarter mile behind Hilbert, though other witnesses dispute this. Myers's intent was to impound the motorcycle, issue citations to Hilbert, and drive them back into town.

Myers was traveling approximately ninety miles per hour when he was just outside city limits, and one hundred miles per hour when he reached County Road 100. During this time he contacted the dispatcher to have the Jay County Sheriff's Department and the Portland Chief of Police informed of the chase. Myers was driving 130 miles per hour when they reached County Road 300. He stated that he was calm, but Officer Chad Ridenour, who was at home asleep, reported that the voices on his police radio woke him, and that Myers sounded nervous and excited when speaking to the dispatcher. Brad Ridenour joined the pursuit. The video tape recorded from his car shows him to be about twenty seconds behind Myers during the pursuit.

Barbara Ashcraft stated in an affidavit that on July 18, 2003, she observed from her backyard a police car chasing a motorcycle at a high rate of speed, about one car length behind the motorcycle. Her house is located near the edge of the Portland city limit.

 Rhonda Bartle stated in her deposition that she was driving westbound on State Road 26 during the chase. She encountered Myers and Hilbert about a mile and a half west of the small town

5

of Bellfontaine. She described the road as being in poor condition. She said the police car was very close behind the motorcycle, less than ten feet away. She also stated the two police cars that passed her had their sirens and lights activated.

Rory and Amanda Campbell live at the southeast corner of County Road 600 and State Road 26, about two miles from where the accident occurred. Amanda Campbell stated that the road was in poor condition. The Campbells were woken by the sound of a motorcycle traveling at a very high speed. They could not see the motorcycle because of an obstructed view, but Amanda Campbell stated she could see the flashing of the police lights from their bedroom. Rory Campbell stated that judging from the sound of the motorcycle and the sound of the police car, the police car was about three seconds behind the motorcycle when it passed by their home. He stated the noise of the motorcycle had quieted by the time the police car passed. Amanda Campbell recalled that about eight to ten seconds passed between the sound of the motorcycle and the police car's siren and lights. She recognized that Rory said the police car was only three seconds behind the motorcycle. She said she is not the best judge of time but ten seconds is her best estimate. Both Rory and Amanda said that more sirens followed.

Dennis and Karen Schwieterman live just east of County Road 700 East, within a mile of where the accident occurred. The Schwietermans also did not see the motorcycle go by, but the sound of it woke them. They went to look outside and saw a police car follow about ten seconds later. Karen and Dennis both stated that there was no police car in front of the car they saw, and that there was no sound of a police siren at the same time they heard the motorcycle go by.

As Myers approached County Road 700, Deputy Simmons reminded Myers of the curve in State Road 26 where it intersected with County Road 800, and Myers began slowing. He stated that

he was about eight tenths of a mile behind Hilbert when he saw Hilbert's legs come off the pegs and the motorcycle leave the road. The accident occurred where Highway 26 curves near County Road 800. After witnessing the accident, Myers notified dispatch that there was an accident requiring emergency medical assistance. This call was made at 1:41 a.m.

Brad Ridenour was a half mile to a mile behind Myers and arrived shortly after the accident. When he arrived, Myers was down the embankment attending to Philebaum and Hilbert. Ridenour also checked on Hilbert and Philebaum. He stated that Myers seemed a little excited, but no more so than normal, and that Myers can be easily excited.

The Portland Police Policy provides in relevant part:

> If, when an officer attempts to stop a violator in accordance with the department procedures and the violator or suspicious person attempts to escape apprehension or elude the officer by accelerating his vehicle or otherwise driving erratically, the officer is obligated to make a reasonable attempt to pursue the suspect or vehicle.
> However, the pursuing officer must terminate any pursuit when the risk of injury or damage to any person resulting from continuation of the pursuit becomes greater than the risk of injury or damage to any person or damage to any property that would result from complete escape of the suspect.

(Portland Police Department Pursuit Driving Policy 1–2; DE 43.) There is a dispute as to whether this portion of the Policy is introductory language not closely followed or whether officers are required to comply with it as they are the rest of the policy. The Policy also states: "A pursuit shall be terminated under these conditions: When such pursuit constitutes imminent danger to the Officer, the party pursued or a third party." (Portland Police Department Pursuit Driving Policy 5; DE 43.) There is a dispute as to whether the pursuit constituted imminent danger under the policy.

Myers returned to Portland at 2:56 a.m., and came to the police station between 5:00 and 7:00 a.m. He was instructed to take photographs of his police car, though he does not remember who told him to do so. Myers stated the pictures were necessary because an attorney, Jill Gonzalez of

7

Muncie, alleged that Myers bumped the motorcycle. Myers said he heard this information from Officer Chad Ridenour, though Chad Ridenour stated he never talked to Jill Gonzalez. The Plaintiff argues Myers had the bumper repainted during the night to cover markings that may have been left when Myers bumped Hilbert's motorcycle and that this is apparent in the photos. The photographs were taken from several feet away and the camera's flash is the main source of lighting. The first picture is from the front of the car and the second is from the side of the car. (Photograph, ex. D to Aff. of Robert Myers; DE 51.) In examining the photograph showing the front of the car, the Court notes that several dark marks appear on the car's front bumper and there is nothing to indicate fresh paint. There is no evidence the bumper was repainted.

The video camera in Ridenour's car recorded his pursuit, but Myers's car camera was not turned on and no videotape was inserted. Myers believed the video recorder in his car was broken. In fact, it had been repaired prior to the start of his shift on July 17, 2003. The videotape from Ridenour's car does not show Hilbert's motorcycle and Myers's police lights are visible in the distance during much of the chase. Ridenour's tape shows Ridenour parking behind Myers's car. Later, Myers is seen entering and exiting his car and walking towards Ridenour's car with an object in his hand. The Plaintiff argues the object is a video tape from Myers's car. According to the Plaintiff, the camera in Myers's car worked and recorded the accident and Myers removed the tape to hide the fact that he hit Hilbert's motorcycle. Myers stated that the object was a notebook  The Court notes that it cannot make out what the object is, and it could be either a videotape or a dark notebook. Myers also stated that the video recorder was in the trunk of the police car, he believed the recorder to be broken, he did not insert a tape, he did not remove a tape from the car, and he may have entered the trunk once during the night to look for a measuring device. The Plaintiff offers no

8

evidence contradicting these statements. It is undisputed that the vide recorder is located in the

trunk. There is no evidence a tape was recorded or that Myers removed such a tape from the trunk.

Myers knew Hilbert before the incident from speaking to him while patrolling a common

youth hangout. He knew Hilbert's age and family. Myers encountered Hilbert during a previous

incident described by Hilbert's former girlfriend Kelly Gibson in her affidavit. In the spring of 2003,

a man named Cleaton Gundle was robbed at gunpoint. He reported that the robber drove a black

truck, and had dark hair and a mustache. Myers received a report that the vehicle they were looking

for was seen pulling in to Country Place Apartments. When Myers approached the apartment, he

recognized the truck as that of Hilbert, who he knew did not have dark hair or a mustache, and who

was not known for carrying guns. Hilbert was at a friend's apartment visiting his girlfriend Kelly

Gibson when Myers arrived with another officer. Myers and the other officer had their guns drawn

and they ordered Hilbert to his knees. Even though Hilbert complied with all orders, he was forced

to the ground, handcuffed, and placed in the police car. Hilbert threatened to sue Myers for the

arrest. Hilbert had not done anything to merit the suspicions of the police other than drive a black

truck, and was extremely frightened by the events. Myers stated that they arrested Hilbert because

the description of the vehicle used in the robbery matched Hilbert's truck. Also, Cleaton Gundle

knew Hilbert, and Gibson stated Gundle would have identified Hilbert if he had been the robber.

There is no evidence that Myers knew that Cleaton Gundle and Hilbert were acquainted or that he

knew Hilbert had done nothing wrong.


**C.     Procedural History**

The Plaintiff filed suit on April 16, 2004. His Complaint alleges claims against Myers and Ridenour for violating Hilbert's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983. The Plaintiff also brings claims against the city of Portland for inadequately training and supervising Myers and Ridenour in violation of Indiana and federal law. Finally the Plaintiff seeks damages from the all Defendants under Indiana tort law.

On May 3, 2004, the Defendants removed the case to federal court. Jurisdiction in this case is based on 28 U.S.C. § 1331. They filed their answer on June 6, 2004. The motion for summary judgment was filed on July 15, 2005. The Plaintiff filed his Response on September 28, 2005. On October 13, 2005, the Defendants filed their Reply along with a motion to strike. On October 31, 2005, the Plaintiff responded, and the Defendants filed their Reply on November 8, 2005.

### D.      Motion to Strike

The Defendants ask the Court to strike the following from the Plaintiff's submissions: first, the testimony of Kelli Ridenour regarding statements made by Jesus Bermudez; second, certain statements made by Kelly Gibson that are conclusory and inadmissable character evidence; third, certain statements made by Robert Moore that are inadmissible character evidence or expert opinion.

### 1.      *Kelli Ridenour's Testimony*

Kelli Ridenour[1] testified in her deposition that her ex-husband Jesus Bermudez told her he

---

[1] Kelli Ridenour is the sister in law of Chad and Brad Ridenour. Chad and Brad are brothers. Kelli married their younger brother Adam Ridenour in 2005. She divorced Jesse Bermudez sometime after July 2003 after a long separation. (Kelli Ridenour's Dep. 4–6, 38, 58–59; DE 43.)

was present during the motorcycle accident. On July 17, 2003, Jesus Bermudez, her ex-husband, was supposed to pick up their child and he never arrived. Several months after the accident, she dropped off her son at Bermudez's residence. While Bermudez and Kelli Ridenour were standing together talking in an alley near Bermudez's residence, Myers drove by in his police car. Kelli Ridenour stated Bermudez became very excited and said: "That f---ing pig. He should be in jail. He should be rotting in jail." (Kelli Ridenour's Dep. 11, Pl. Ex. 5; DE 43.) He went on to say that "I saw it all." After that, he said "nevermind," and they went on with their conversation. (Kelli Ridenour's Dep. 11; DE 43.)

A few days later, Kelli Ridenour was on the phone with Bermudez, when Bermudez stated he was leaving town because the police were watching him. He then went on to tell Kelli how he was coming back from Fort Recovery on the night he was supposed to pick up their son from Kelli, that is, July 18, 2003. He was driving with two other men in a black Ford F-150 truck, when he saw police lights and pulled over to the side of the road. Brandon Hilbert almost sideswiped him because he was driving in the middle of the road. After pulling over, he looked back and saw Myers bump the back of the motorcycle and that the riders both flew off of the motorcycle. According to Kelli Ridenour, Bermudez was an illegal alien and has since returned to Mexico.

The Plaintiff seeks to have this hearsay testimony admitted as an excited utterance. Federal Rule of Evidence 803(2) allows hearsay to be admitted if: 1) there is a startling event; 2) the declarant made the statement while under the stress of excitement caused by the event; and 3) the declarant's statement relates to the startling event. *United States v. Wesela*, 223 F.3d 656, 663 (7th Cir. 2000). "The basis of the exception is that 'such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation.'" *Id.* "All that the exception

11

requires is that the statement be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself." *Id.* (quoting *Smith v. Fairman*, 862 F.2d 630, 636 (7th Cir. 1988)). "Furthermore, the trial court must be able to determine that the declarant's state of mind at the time that the statement was made precluded conscious reflection on the subject of the statement." *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999).

Here, a startling event took place on July 18, 2003, and the declarant's statements relate to that event. However, the statements did not occur until months later, well after the stress of the excitement dissipated. The circumstances in no way eliminate the possibility of fabrication on the part of Bermudez, as he had months after the accident to reflect on the events. Bermudez's statements took place after local newspapers reported that Hilbert's father accused Myers of hitting his son's motorcycle. (Kelli Ridenour's Dep. 18, Pl. Ex. 5; DE 43.) This exception does not apply.

Even if the Court considered Bermudez's observation of Myers an independent startling event, the excitement of that event dissipated before Bermudez related his story to Kelli. According to Kelli Ridenour's testimony, after becoming excited he said "nevermind," and they resumed their conversation. The excitement had passed, and anything he said after that could have been the result of fabrication, as he had apparently regained his senses, and conscious reflection became possible. The subsequent phone conversation where Bermudez gave his account of the accident occurred days later. The Plaintiff has offered no case in which hearsay made so long after the exciting event has been found admissible under the exception.  For these reasons, none of Bermudez's hearsay statements are admissible and they are stricken.

**2.      *Kelly Gibson's Statements***

Kelly Gibson is Hilbert's former girlfriend. In paragraph six of her affidavit she described the detention of Hilbert for armed robbery and in paragraph seven she mentioned other incidents involving Myers.

The Defendants challenge the admissibility the statements in paragraph six as not within Gibson's personal knowledge. Federal Rule of Civil Procedure 56(e) states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts." *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

Gibson's statement that Hilbert and the victim knew each other well, that Hilbert had not done anything to merit the officers' suspicion, and that Hilbert drove a black truck could be within her personal knowledge because she states that she knew Hilbert well. Also, her statement that the victim would certainly have advised police of the robber's identity if Hilbert had been his attacker is a reasonable inference in light of the fact that Hilbert and Gundle were acquainted. However, there appears no basis for Gibson's conclusion that Myers knew for a fact that Hilbert was not involved. Gibson offers no reason to think she has any insight into what Myers knew at the time. This statement must be stricken.

Kelly Gibson stated in paragraph seven of her affidavit that Myers abuses his authority to harass young people. However, she has given no specifics other than her statement that he "accosted" her on her porch for no reason. The Defendants argue the statements are inadmissible because they are conclusory and in violation of Federal Rule of Evidence 404. The Plaintiff argues

13

they are offered to show Officer Myer's intent to harass Hilbert on the night of the accident. The Court agrees with the Defendants. Gibson gave no specifics; she made only a general assertion that harassment occurred.

Rule 404(b) allows the introduction of past incidents to show intent and motive. The incidents alleged might be relevant to show Myers's intent. However, because Gibson has given no description of the events, the Court cannot determine whether the past incidents are relevant or whether they tend to suggest anything about Myers's intent in pursuing Hilbert. As stated by the Seventh Circuit in *Drake*, 134 F.3d at 887: "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Id.* Gibson's statements regarding these past events contain no specific facts and the Court will not consider them.

Also, Gibson stated that Myers was known for abusing his authority. This is not a description of a past incident; it is evidence of Myers's reputation. Evidence regarding reputation is generally not admissible to prove action in conformity with such reputation, and no exception applies here. Fed. R. Evid. 404(a). All of paragraph seven is stricken.

### 3.      *Robert Moore's Statements*

Robert Moore is a former police officer. In his affidavit, he gave his views regarding Myers's temperament, Portland police policies, and Portland police training. The Defendants argue that Moore's statements regarding Myers are inadmissible character evidence. Also, they argue that because Moore has not been qualified as an expert, his opinions as to proper police procedure in the circumstances that arose on July 18, 2003, are inadmissible.

14

Regarding Myers's character, Moore stated that Myers is aggressive and competitive in carrying out his duties, and recounted an episode in which Myers was disappointed at being ordered to discontinue the pursuit of a suspect. The Plaintiff argues the evidence shows Myers's motive or intent. The Defendants argue the evidence is not offered to show motive or intent, but to prove acts in conformity with Myers's character.

Rule 404 allows the admission of evidence regarding other "crimes, wrongs, or acts" for purposes other than to prove character. Fed. R. Evid. 404(b). Moore's statement that Myers is competitive and aggressive is not evidence of another crime, wrong, or act; it is reputation testimony and is therefore inadmissible character evidence.

The evidence of the episode in which Myers expressed disappointment at ending pursuit of a fleeing felon is evidence of a prior act, but it is not relevant to show anything about Myers's intent or motives. To be admissible under 404(b), the evidence must tend to suggest something other than conduct in conformity with Myers's character. The Plaintiff suggests it is relevant to show Myers's intentions, but he does not articulate how it is relevant. Moore does not state why Myers wanted to continue pursuit, and the incident seems only intended to portray Myers as aggressive. Without knowing why Myers wanted to continue pursuit, the description of the incident suggests nothing about Myers's intentions in this case. Thus, it must be stricken.

In paragraph six of Moore's affidavit, Moore stated that Myers's actions in dealing with Hilbert on July 18, 2003, were in violation of Portland police department policies. The Defendants argue that this is expert testimony and they have not been given notice that Moore is an expert as required by Federal Rule of Civil Procedure 26(a)(2), and so Moore's expert testimony must be stricken as required by Rule 37(c). The Plaintiff argues that Moore's testimony is not expert

testimony, and if it is, it did not need to be disclosed because he is not retained, and if it did need

to be disclosed, failure to disclose can be excused because his testimony only became necessary after

a late discovery response by the Defendants.

For testimony to be considered lay testimony, it must be based on the witness's own

perception. Federal Rules of Evidence 701; *United States v. Allen*, 10 F.3d 405, 414 (7th Cir. 1993).

Moore's opinion is not based on his own observations and he had no personal knowledge of the

events on July 18, 2003. He was not present during any of the events and does not appear to have

done any investigation other than read the case report of the incident prepared by Myers. His opinion

as to whether Myers complied with police procedures must be considered expert testimony if it is

to be admissible.

Federal Rule of Civil Procedure 26(a)(2) requires a party to notify the opposing party of its

expert witnesses, whether they are retained or not. The Plaintiff admits that Moore was not identified

as a witness until after the Defendants' motion for summary judgment was filed, even though expert

witness disclosure was due in January. The Defendants' motion was filed on July 15, 2005, the same

day discovery was to be completed. Thus, the Plaintiff failed to notify the Defendants as required

by Rule 26(a)(2) that they intended to use Moore's testimony.

Rule 37(c) states: "A party that without substantial justification fails to disclose information

required by Rule 26(a) . . ., is not, unless such failure is harmless, permitted to use as evidence . .

. on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c). The only

justification offered by the Plaintiff is that he did not see any need for an expert until after July 15,

2005, when the Defendants responded to the Plaintiff's discovery request. The discovery request

related to the extent of Myers's training. The Defendants state that they did not receive the discovery

request until June15, 2005, well after the deadline for notifying opposing party of the identities of its experts. Also, the Court does not understand how the discovery that Myers was well trained makes relevant whether Myers violated police department policy. The discovery response seems to have little relevance to Moore's testimony. The Plaintiff has provided insufficient justification for failing to notify the Defendants of their expert as required by Rule 26(a)(2).

Finally, the Plaintiff's failure is not harmless. The Defendants were deprived of the ability to question Moore as an expert witness in preparing their motion for summary judgment. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (finding it within district court's discretion to exclude testimony under 37(c) where Plaintiff failed to identify expert in time to allow Defense to question expert). The portion of Moore's testimony that constitutes expert opinion is inadmissible for purposes of this motion.

**E.     Plaintiff's Federal Claims against Officers Myers and Ridenour**

The Plaintiff's Complaint asserts two federal claims against Officers Myers and Ridenour. The first claim is for a violation of Hilbert's Fourth Amendment rights and the second is for a violation of Hilbert's due process rights under the Fourteenth Amendment.

 "To state a claim under 42 U.S.C. § 1983, a plaintiff must present facts sufficient to show that the defendants, acting under color of state law, deprived him of a specific right or interest secured by the Constitution or laws of the United States." *Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003). Here, the Defendants were acting under color of state law. The question is whether the Defendants violated Hilbert's Fourth Amendment rights or his due process rights.

At this point, the Court notes there is no evidence that Ridenour was involved in the accident

or engaged in any conduct violating the Plaintiff's rights. The video from Ridenour's car clearly shows that he followed the pursuit at a distance. The Plaintiff does not argue otherwise and focuses attention on Myers's conduct. The claims against Ridenour are therefore dismissed.

**1.      *Plaintiff's Section 1983 Claim for Violation of Hilbert's Fourth Amendment Rights***

Both parties agree that "[i]t is only when a fleeing suspect is forcibly halted that a seizure occurs and Fourth Amendment protections come into play." *Carroll v. Borough of State College*, 854 F. Supp. 1184, 1190–91 (M.D. Pa. 1994); *see also Bublitz v. Cottey,* 327 F.3d 485, 489 (7th Cir. 2003) (stating that a seizure occurs only when "there is governmental termination of freedom of movement through means intentionally applied"). The Defendants argue Hilbert was not forcibly halted and therefore, no seizure occurred.

The Plaintiff argues there is a material issue of fact as to whether Myers's vehicle struck Hilbert's motorcycle, thereby terminating Hilbert's freedom of movement. The Plaintiff argues this may be reasonably inferred from the fact that Myers was very close behind Hilbert's motorcycle during the chase. Also, the Plaintiff argues that the photographs of Myers's car show a freshly painted bumper and the videotape from Ridenour's car shows Myers removing the police videotape from his car to destroy evidence of the contact between the motorcycle and his car.

It is the Court's view that it is not reasonable to infer from the evidence presented that Myers made any contact with Hilbert's motorcycle. It is unsupported speculation. "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). The testimony of those nearest the accident scene, the Campbells and the Schwietermans, is undisputed. Rory Campbell said he  heard a police car about three seconds behind Hilbert, and the

18

Schwietermans and Amanda Campbell stated a police car passed by ten seconds after Hilbert's motorcycle. Their statements are consistent with Myers's testimony that he slowed down as he approached the curve, having been reminded of the curve over the police radio. The Plaintiff has offered no evidence disputing this, other than unsupported speculation regarding the photographic and video evidence submitted.

The photograph does not suggest Myers repainted his bumper overnight after the accident; in the picture, brown splotches are apparent on the bumper. Myers denied repainting his bumper and there is no evidence suggesting Myers repainted his bumper. The Plaintiff's argument is unsupported speculation.

There is also no evidence that Myers removed the video tape from his car. The videotape from Ridenour's car is not clear enough to determine what Myers had in his hand as he left his car, though it makes little difference. Myers stated the video recorder was in the trunk, and he would have had to enter the trunk to remove a videotape from the recorder. The video does not show Myers opening the trunk, but he states he may have entered the trunk to obtain a measuring device at some point during the night. There is no evidence Myers entered the trunk to remove a tape. There is also no evidence contradicting Myers's explanation of why no recording was taken from his car. The video recorder had been broken and Myers did not know it had been fixed. For that reason, he put no video tape into the recorder. In any event, there is no evidence that a tape was recorded from Myers's vehicle or that Myers destroyed such a tape. The Plaintiff's argument to the contrary is just more speculation, not evidence.

There is no evidence that Myers's vehicle struck Hilbert's motorcycle, and thus Hilbert was never seized. The Defendants' motion for judgment on the Plaintiff's section 1983 claim alleging

a violation of Hilbert's Fourth Amendment rights must be granted.

### 2.     *Plaintiff's Section 1983 Claim for Violation of Hilbert's Due Process Rights*

The Plaintiff also asserts a claim for violation of Hilbert's Due Process rights. The Supreme Court held in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), that a plaintiff could recover for injury resulting from a high-speed police chase if the plaintiff can show the pursuing officer had the intent to cause harm to the suspect, "unrelated to the legitimate object of arrest," so that the officer's conduct "shocked the conscience." *Id.* at 836. "[H]igh-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability." *Lewis*, 523 U.S. at 854. The Defendants argue that there is no evidence that Myers had intent to harm Hilbert so that Myers's pursuit shocks the conscience.

The Plaintiff argues that Myers did intend to physically harm Hilbert. The Plaintiff states that Myers knew Hilbert personally, knew his age, his family, and where he lived. Myers had a previous encounter with Hilbert that the Plaintiff claims shows Myers's hostility to Hilbert. Myers detained Hilbert on suspicion of armed robbery with his gun drawn, forcibly shoving Hilbert to the ground while shouting at him. During this incident, Hilbert threatened to sue Myers. The Plaintiff argues that Myers's conduct during the night of July 18, 2003, also shows his intent to harm Hilbert. Myers saw Hilbert stationary on his motorcycle on two occasions, yet chose not stop him for driving on suspended license or without a motorcycle endorsement. He waited along Hilbert's likely route where he would encounter Hilbert while he was driving. The Plaintiff claims Myers was seeking to embarrass Hilbert by pulling him over in front of a youth hangout. When Myers did encounter Hilbert, he did not attempt to pull him over until Hilbert began accelerating away from Myers,

beginning the high-speed chase. According to the Plaintiff, Myers's decision to continue pursuit and conduct in pursuing suggest improper intent as well. Knowing where Hilbert lived, Myers continued the pursuit for eight miles, at 130 miles per hour, at times very close behind Hilbert, over road in poor condition.

Taking all reasonable inferences to favor the Plaintiff, the Court finds the Plaintiff has failed to present sufficient evidence that Myers intended to cause a harm to Hilbert that shocks the conscience. There is no material issue as to Myers's intent. After the pursuit began, Myers intended to impound the motorcycle and bring Hilbert and Philebaum back to town. Myers stated that he believed Hilbert would eventually pull over on his own, but if he did not, Myers intended to pursue Hilbert to the Ohio state line. This does not shock the conscience.

An intent to cause harm related to a legitimate government purpose does not shock the conscience. Hilbert was operating a motorcycle with a suspended license and no motorcycle endorsement. Myers had a right to pull him over and give him a ticket; this is a legitimate government purpose. Myers intended to accomplish this purpose by pursuing Hilbert. Being ticketed may have caused Hilbert a loss of money and embarrassment, and being pursued in a police chase may have caused Hilbert fear and intimidation. However, these harms are related to a legitimate government purpose: ticketing lawbreakers and removing unlicensed drivers from the road. An intent to fulfill a legitimate government purpose knowing that these harms may occur does not shock the conscience. There is no evidence that Myers intended Hilbert to suffer any other type of harm, such as physical injury or death. Thus, the *Lewis* test is not satisfied.

The fact that Myers saw Hilbert on the motorcycle on two occasions before the start of the chase does not imply anything as to Myers's intentions. The Plaintiff suggests Myers was playing

21

a cat and mouse game with Hilbert. This is speculation. Myers had not yet heard from the police dispatcher confirmation regarding whether Hilbert's license was suspended or whether he was lacking a motorcycle endorsement. The fact that Myers waited to confirm his suspicions does not suggest any bad intent on his part.

Hilbert's previous incident with Myers also does not suggest any bad intent on Myers's behalf. The Plaintiff argues this event shows Myers's animosity towards Hilbert. The victim of the robbery, Cleaton Gundle, was a friend of Hilbert, and presumably would have identified Hilbert had Hilbert been his assailant. Also, Hilbert had done nothing to suggest he would commit armed robbery. However, there is no evidence that Myers knew any of this. Myers received a report that the vehicle they were looking for was seen pulling in to Country Place Apartments. Upon arriving, Myers recognized the truck as Hilbert's black Ford. Hilbert came walking out and Myers arrested him with guns drawn, because the report was that the suspect was armed. Hilbert had no involvement, but because of the description of the truck and report as to its location, Myers believed Hilbert was responsible. Hilbert's statement to Myers that he would sue does not show any animosity on behalf of Myers towards Hilbert.

Finally, assuming Myers violated Portland police policies regarding police chases, this violation does not make it reasonable to infer that Myers intended to harm Hilbert. *Davis v. Township of Hillside*, 190 F.3d 167, 170 (3d Cir. 1999) ("*Lewis* thus squarely refutes plaintiff's contention that the officers' violation of police department regulations, which might be probative of recklessness or conscious disregard of plaintiff's safety, suffices to meet the shocks-the-conscience test under the due process clause."). Even if the Court considered the policy to be relevant, the circumstances do not justify the inference that Myers intended to harm Hilbert.

22

Here, the whole incident took less than twenty minutes. The policy requires a reasonable attempt to pursue as well as a determination weighing the dangers from proceeding with the chase to the dangers from ending the chase. Such a determination is not difficult in hindsight, but during the frantic minutes of the chase, a failure to weigh properly the dangers does not imply an intent to do harm.

The Plaintiff cites *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986), in support of his argument that the facts here are sufficient to create a material issue of fact as to Myers's intent. In *Checki*, an unmarked police car rapidly approached the rear of a car on the highway without turning on its lights or sirens. The unmarked police car tailgated within two or three feet of the other car for twenty miles at speeds up to one hundred miles per hour. The driver and passenger in the car being pursued had no indication that they were being pursued by police, and sought to escape from the harassing driver. After twenty miles, the driver of the police car activated the lights and siren. Those in the pursuing car did not believe the car behind them was a police car, and continued to flee. They were finally stopped at a police roadblock 31 miles from where the incident began. *Id.* at 535–36.

*Checki* was decided twelve years before the Supreme Court decided *Lewis* and did not directly address whether the police conduct shocked the conscience; the decision determined which of two possible districts was the proper venue. The court found the police conduct could be actionable under § 1983 as a violation of Fourteenth Amendment due process. The Supreme Court in *Lewis* cited *Checki* for the proposition that a police officer may not be held liable for negligent use of a vehicle, but may be held liable for intentionally causing or threatening physical injury through the misuse of a vehicle. *Lewis*, 523 U.S. at 854 n.13. However, the *Checki* court did not determine whether the police conduct alone allowed the inference that the conduct was intentional,

23

stating only that "[f]actual development in this case could lead to a jury question whether [the police officers'] car-chasing actions were 'inspired by malice.'" *Id.* at 538. *Checki* gives little aid in determining what level of conduct is sufficiently egregious to find a material issue as to an officer's intent in engaging in a police chase.

Finally, the Plaintiff argues that Myers at least intended to "worsen the legal plight" of Hilbert. The Supreme Court in *Lewis* stated: "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability." *Lewis*, 523 U.S. at 854. With respect to this phrase, the Court finds the Eight Circuit's interpretation convincing. The Eight Circuit in *Slusarchuk v. Hoff*, 346 F.3d 1178, 1183 (8th Cir. 2003), addressing this language, stated:

> The Court did not further explain what it meant by an intent to worsen legal plight, but the sentence was followed by footnote 13, which discussed a prior Fifth Circuit case involving alleged "intentional misuse" of a police officer's vehicle to terrorize a citizen. *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir.1986). We decline to read the term expansively, as appellees urge, because every police pursuit is intended to "worsen [the] legal plight" of the suspect by arresting him. Thus, a broad reading would eviscerate the intent-to-harm standard that the Court adopted, at least in part, to sharply limit substantive due process liability. Rather, we construe the term as applying only to a narrow category of pursuits that reflect a conscience-shocking motive beyond the realm of legitimate government action but do not involve an intent to inflict physical harm.

*Slusarchuk*, 346 F.3d at 1183. As stated by the *Slusarchuk* court, the language regarding intent to worsen the legal plight of a suspect applies to cases involving an intent to do something other than physically harm a suspect that shocks the conscience. The facts of *Checki* provide an example. Though it is unclear what the officer's intent was in chasing the car for twenty miles without activating lights and sirens, one can imagine several conscience-shocking motives other than causing physical harm. Perhaps the chase of an innocent motorist was intended to give the appearance of cause to arrest the motorist, collect a greater fine, or seize his car. Causing an innocent motorist to flee in order to accomplish these objectives would shock the conscience. However, there is no reason

24

to consider such scenarios further, as this is not such a case. There is no evidence Myers had a conscience shocking motive in pursuing Hilbert.

There is no material issue regarding Myers's intent. Taking all reasonable inferences to favor the Plaintiff, the evidence does not suggest that Myers had the intent to cause the type of harm that shocks the conscience under *Lewis*. Thus, the Plaintiff's claims under the Fourteenth Amendment are dismissed.

**F.      Plaintiff's Claims against the City for Inadequate Training and Supervision**

The Plaintiff also asserts a claim against the city under § 1983 for failing to adequately train and supervise Myers and Ridenour. However, it appears that the Plaintiff has abandoned this claim after discovering the training received by Myers, as no argument is offered in response to the Defendant's request for summary judgment on this claim. In any event, municipalities can be liable under § 1983 only where there is individual liability against the officers on the underlying substantive claim. *Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003) ("A plaintiff must prove that the individual officers are liable on the underlying substantive claim in order to recover damages from a municipality under either a failure to train or failure to implement theory."). Here, the Court holds there is no liability for the underlying offense, and so summary judgment is appropriate on the federal claims against the city.

**G.      Plaintiff's State Law Claims**

Title 28 U.S.C. § 1367 gives a district court supplemental jurisdiction over state law claims that are part of the same case or controversy as the federal claims giving the district court original

25

jurisdiction. Section 1367(c) allows a district court to decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction. "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244 (7th Cir. 1994)). In a normal case "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law" weigh in favor of dismissal of state law claims. *Id.* at 728. While there are unusual cases in which judicial economy, convenience, fairness, and comity suggest that a district court ought to retain jurisdiction over supplemental state claims, this is not such a case. Because all that remains are claims arising under Indiana law, the Court declines to exercise supplemental jurisdiction to decide those claims.

**H.     Conclusion**

This was truly a tragic event. However, this does not affect the Court's role in deciding this case. The Court must base its opinion on the law and the evidence submitted. It is the Court's ruling that there is no admissible evidence suggesting the police officers involved in the chase made any contact with Brandon Hilbert's motorcycle or had any intent to cause harm to him or his passenger Robyn so as to shock the conscience.

**ORDER**

For the reasons stated above, the Defendants' motion for summary judgment [DE 27] is GRANTED insofar as it seeks judgment on the Plaintiff's federal claims. The Defendants' motion

to strike [DE 48] is GRANTED IN PART and DENIED IN PART, as stated above. The Court declines to exercise its supplemental jurisdiction over the remaining state law claims. Therefore, the Plaintiff's remaining state law claims are REMANDED to Jay County Circuit Court.

SO ORDERED on February 13, 2006.

   /s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT